(35 Misc. Rep. 489.)

### ISELIN et al. v. GOLDSTEIN et al.

(Supreme Court, Special Term, New York County. July, 1901.)

1. CREDITOR'S SUIT—FRAUDULENT PREFERENCE—EVIDENCE.

On November 4, 1895, a failing debtor assigned accounts owing him to the amount of $20,000, being all that he had of value, and on the next business day confessed judgments in favor of his sister-in-law for $2,000, and his brother-in-law for nearly $8,000, on which judgments speedy

executions were issued, and his business sold out thereunder. On the same day he drew his balance of cash in bank of $1,800, by which he denuded himself of his entire property, leaving his general creditors for merchandise entirely unpaid. In an action by creditors to set aside such conveyances, while admitting that he kept the usual books of account, he refused to give even a plausible explanation of what had become of them, nor was there any evidence that the books showed any entries of the receipt of such sums claimed to have been loaned to him by his father-in-law, his sister-in-law, and his brother-in-law, to repay which it was alleged the conveyances were made. *Held*, that the facts and circumstances sufficiently showed that the transfer was fraudulent, and was not an honest preference to a just creditor.

2. BANKRUPTCY PROCEEDINGS—EFFECT.

Where creditors defrauded by their debtor's fraudulent conveyance of his property with intent to deprive them of their security have timely begun an action to set aside the transfer, their equitable lien acquired on the property thereby cannot be affected by the debtor's subsequently taking voluntary proceedings to have himself declared a bankrupt, since his trustee in bankruptcy takes only the residuum.

Action by William E. Iselin and others against Moses F. Goldstein and another to set aside transfers as fraudulent as to the transferror's creditors. Judgment for plaintiffs.

Blumenstiel & Hirsch (A. Blumenstiel, of counsel), for plaintiffs.
Platzek & Stroock, for defendant Neuberger.
David B. Cahn, for defendant Goldstein.

RUSSELL, J. The plaintiffs, judgment creditors of Goldstein, seek to set aside his transfer to his father-in-law, Neuberger, of a large amount of accounts made on the eve of Goldstein's failure. On the 4th day of November, 1895, Goldstein assigned accounts owing him to the amount of $20,112.52, being all that he had of any value, and on the 6th of November—the 5th being election day—consented to judgments in favor of his sister-in-law, Helen Rosenberg, for $2,087.10, and his brother-in-law, Leo Loeb, for $7,-736.50, on which judgments speedy executions were issued, and his business stock of goods of hosiery and underwear at 456 Broadway, New York City, was sold out; and on the same day he drew out his balance of cash in the Chemical National Bank of $1,800, by which means he denuded himself of his entire property, leaving entirely unpaid the general creditors who had furnished him the merchandise, the proceeds of which went apparently to his brother-in-law and sister-in-law, and out of which the accounts came which were assigned to his father-in-law, to the amount of $49,000, entirely unpaid. He had previously, on the 24th and 31st of October, drawn from the Chemical Bank the sums of $1,150 and $5,000. These naked facts require some explanation from the lips of those into whose pockets more than $25,000 in cash is traced. That explanation is sought to be given by the proof tendered of an honest preference by a failing debtor to just creditors for moneys advanced. It is very true that, aside from the provisions of the general bankrupt act of the United States, such preferences may be made. But the right to give and take preferences cannot lie upon a corrupt foundation. The course of the honest debtor succumbing to unmerited misfortune bears clear exposure to the light. He has tried

to make a success of his business operations, and, even though ruin may come from possible want of skill or energy, not a step of his career is marked by any scheme designed to throw shadows upon his business acts so that they may be concealed from inspection. He keeps books of accounts showing of whom he buys and to whom he sells, of the sums borrowed from individuals and banks, of the various ways in which his moneys are paid out as well as received, and of every transaction of debit and credit, which may be read in plain figures in after months and years. Such books are essential for his own safety, even though he has no suspicion of failure. He cannot settle with creditors or debtors for goods bought or sold, or know his own standing from day to day, without them. Another presumption is added to their necessity in a case like this. Knowing, as Goldstein did, the approaching end of his business transactions, unless conducted under the cover of another's name, and of his own desire to benefit his near connections with all that he had, to the absolute loss of his creditors, he knew well that scrutinizing inquiry would be made as to his business operations, and the state of accounts between himself and those connections, out of which they claimed to absorb his all. Yet in the face of all this he conceals the light which his books would afford. He admits the possession of the usual books of account, including cash books and check books, but refuses to give even a plausible explanation of what has become of them; and so there is not one particle of evidence that his books showed any entries of the receipt of the various sums claimed to have been loaned him at various times by his father-in-law, sister-in-law, and brother-in-law to the amount of some $20,700, or of $10,000 loaned to him by his other brother-in-law, Herbst, as claimed at the close of the trial for the first time, and then offered in the effort to account for his withdrawal of $5,000 four days before the failure. Nor does the defendant father-in-law, Neuberger, present upon this trial a much better disposition to throw light upon those business relations with his son-in-law, except as the shafts disclose such partial views of the situation as may suit his prepared case. He claims to have made, from the 2d day of January, 1891, to the 26th day of October, 1893, to his son-in-law, Goldstein, nine loans, partly in currency and partly by checks, of which the smallest was $700, and the four largest $2,000 each. His books, too, are not to be found, although he was the senior member of the business firm of M. Neuberger & Co. He does not say they are destroyed, but they cannot be found. They may possibly have been sold, to be manufactured into pulp. The very inadequacy of explanation that his firm had sold books of account showing transactions of recent years yet pending, and their daily course of business yet lapping over into the future, demonstrates better than even mere refusal to answer a conscious perception of the necessity of explanation, and that the truth would injure far more than the intelligent choice of silence.

The presumptions drawn from the refusal of these defendants to throw light upon their transaction is intensified by other facts. By statement made March 21, 1894, of the inventory of December

31, 1893, and by his testimony on the trial, Goldstein averred it to be true that his stock, outstandings, and cash at that time amounted to $43,731, and his liabilities $12,600, leaving a surplus of $31,131. Those liabilities, he asserted, consisted of indebtedness for merchandise, $3,600, and loan from the banks, $9,000. He and Neuberger now testify that at this period the whole sum of $12,700 for money borrowed was owing Neuberger, with interest, none of which had been paid. Goldstein either then falsified his inventory, as stated to the commercial agency, for the purpose of bolstering up false credit, and with a view to the scheme of fraudulent bankruptcy, or he did not in fact owe his father-in-law. One horn of the dilemma he must take. Either one condemns him as to the creditors who thereafter trusted him, lulled into a false sense of security as to his solvency and honor. And his previous financial statements during the periods when it is asserted these loans were made by the father-in-law confirm the conclusion drawn from the inventory of December 31, 1893. Nor is the defendant Neuberger free from inferential acquiescence in the course of conduct of his son-in-law. Up to the exigency of the last moment, when it became necessary to gather in great haste all that creditors could reach, the claims of the father-in-law were passive, and his action unusual in an honest creditor. Aside from receipts or notes which may have been made at any time, and which do not afford proof of indebtedness when their substantial basis is challenged, he presents no books of accounts. He says that he had a memorandum book, which he does not produce, and the absence of which he does not satisfactorily account for. He makes his alleged loans partly in checks, not produced, and in currency. His withdrawals from the banks on various occasions may well have been used as items of loans, when his books would show they were used for a very different purpose. He demands no interest during the years from January, 1891, to November, 1895, and thereafter figures up compounded interest on the amount of his loans to reach the approximate total to what he says is the net sum realized from the transfer of accounts. He separates the sums received on those accounts from his other banking accounts by depositing in a new banking house, withdraws considerable of those sums for his daughter, the wife of the debtor, and suffers that debtor to use those sums under cover of a power of attorney from the wife. He withdraws other sums for the purchase of real estate taken in the name of Joseph Rosenberg, another son-in-law, and allows the rents to be collected by the debtor, Goldstein, without payment over or accounting. Except for the accomplishment of the purpose to take away from the reach of the law all of the property which Goldstein had, the execution of which was initiated on the 4th of November, 1895, and the speedy action necessary to accomplish that purpose, the whole conduct of Neuberger is inconsistent with that of a creditor acting in a business way with a continuous purpose of preserving the relations of creditor and debtor between him and the other party; but is entirely consistent with the position of a father-in-law who may have been very willing to advance some sums to a daughter

towards her portion by assisting the husband in business, but without any view of ever pressing that husband to repay the same, or of entering whatever moneys were advanced and were not repaid in his business books as business loans, to be collected in the future. The very effort which Neuberger makes upon the trial to show many business transactions between him and Goldstein by loans made through checks, which Neuberger does produce upon the trial, and which he admits were repaid, and which could not be counted in to uphold the transaction of November 4, 1895, because they had placed themselves upon the nine alleged loans of earlier dates beyond recall, demonstrates the essential difference between the transactions which were intended as business affairs and those which never were so regarded until they could be made use of to absorb all that Goldstein had for the benefit of his wife and himself, his business career under his own name being thenceforth a failure. On the 19th of February, 1895, to obtain a relief from personal assessment, Neuberger made affidavit that he had no personal property. If he then had a secured claim for upward of $16,000, afterwards fully realized, that affidavit was untrue. If, in his own conscience, he was aware that he had no legal claim to the moneys arising upon this transfer of accounts, but was simply acting as a shield to benefit those near unto him, that affidavit may have been true. It is more consistent with the version that the moneys, whatever their amounts were, which passed from him to his son-in-law, were not the basis of legal liability against that son-in-law, than the other one that his claim was just in the law, it being in fact well secured.

There are numerous circumstances in the details of the business life of Goldstein for five years before his failure, including the asserted circumstances of the manner of the origin of the claims of Helen Rosenberg and Leo Loeb, and their participating action in the hasty sweeping away of Goldstein's property in November, 1895, which corroborate the presumptions heretofore alluded to. It is unnecessary to review them in this opinion in order to reach the conclusion to which this court has arrived. Transactions between a father-in-law and the husband of his daughter, in which she is deeply concerned, cannot hang suspended, to be turned into advancements or the sharings of a portion of accumulated wealth, or into protecting loans, as occasion may require, and then used to the great detriment of trusting creditors of the son-in-law, who have the right to current knowledge of the financial situation of the latter to a reasonable certainty. Nor was Neuberger more free from assumed participation in the accomplishment of a result in which he lent the necessary aid, nor could he claim a preference begotten out of the fraud perpetrated upon the creditors by Goldstein, who did not select an innocent purchaser to advance money upon a transaction secretly designed by him to defraud, but used his father-in-law under an assumed claim of indebtedness to him, that father-in-law parting with nothing of value in the culminating act, and who preserves unimpaired any rightful claim he may have against the debtor. I therefore hold that, upon the proof in this case, the transfer of the

accounts on the 4th of November, 1895, was a fraud upon the creditors of Goldstein, and the subsequent proceedings in bankruptcy cannot affect the equitable lien acquired by the commencement of this action long before the passage of the bankrupt act. Commissioners v. Earle, 110 U. S. 710, 716, 4 Sup. Ct. 226, 28 L. Ed. 301; Edmeston v. Lyde, 1 Paige, 637, 19 Am. Dec. 454; Bank v. Shuler, 153 N. Y. 163, 47 N. E. 262. The trustee in bankruptcy took only the residuum which the debtor had on the 3d day of June, 1899, this action having been begun long before. The judgment debtor could not, by proceedings in bankruptcy, further his scheme in any manner by destroying the equitable lien obtained by his creditors through the commencement of this action. Judgment is therefore directed that the transfer of accounts be set aside as fraudulent and void; that a receiver be appointed, to whom shall be paid the amount received by Neuberger upon the accounts so transferred, with interest from November 4, 1895; or that, at his election, Neuberger pay over to the plaintiffs the full amount of their claim and interest, with the costs of this action, and that the plaintiffs recover of the defendants such costs.

Judgment accordingly.